**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ulta-Lit Tree Company, | No. CV-19-05340-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Simple Living Solutions LLC, | |
| Defendant. | |

Pending before the Court in this patent case is the matter of claim construction. The parties filed a Joint Claim Construction Chart (Doc. 72), after which Plaintiff Ulta-Lit Tree Co. ("Ulta-Lit") filed its Opening Brief (Doc. 73). Defendant Simple Living Solutions LLC ("Simple Living") filed a Response Brief (Doc. 74), and Ulta-Lit filed a Reply Brief (Doc. 75). On March 30, 2021, the Court conducted a *Markman* hearing (Doc. 81). *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). This Order sets forth the Court's constructions of the disputed terms and phrases.

**I.     Background**

This case is about light testers. Specifically, it is about devices that test the strings of lights commonly seen during the holiday season. Individual lights on those strings may malfunction, and Ulta-Lit sells devices that identify where in the string the bad bulb lies. (Doc. 1 at ¶ 9). Not all light strings work in the same way, and so they require different testing devices.

One of Ulta-Lit's devices, the "LED Keeper," is designed to identify malfunctions

in strings of light emitting diodes, LEDs for short. (*Id.* at ¶ 13). Ulta-Lit's customers call this product the "Yellow Gun." (*Id.* at ¶ 15). As that name implies, it is a yellow, handheld device, activated with a trigger. Ulta-Lit owns the Patent that the Yellow Gun practices, LED Light String Diagnostic and Repair System, U.S. Patent No. 9,500,719 (filed Nov. 1, 2012) (the "'719 Patent"). (*Id.* at ¶¶ 23, 26). Ulta-Lit alleges that Simple Living, which sells a green, gun-shaped device capable of testing LED light strings, has infringed on the '719 Patent. (*Id.* at ¶¶ 61–89).

The Yellow Gun works by connecting to the light string and applying power to see which bulbs illuminate and which do not. Beyond this general description, the Court need not dive into the particulars of how the '719 Patent operates, except to say something about electrical power. The '719 Patent discusses how the device would use both alternating current and direct current, AC and DC. *See, e.g.,* '719 Patent, col. 23 ll. 37–44. In addition, the Patent delves into how the device may use more nuanced types of electrical current such as "full-wave rectified waveform" and "half-wave cycle" power. *See id.* at figs. 4a; 5b.

Based on the parties' remarks at the *Markman* hearing, there is no dispute that full-wave rectified waveform is a form of AC power. However, the parties do seem to dispute whether half-wave cycles are properly construed as AC or DC power. At the *Markman* hearing, counsel for Simple Living referred to this type of current as DC power, while counsel for Ulta-Lit characterized it as AC power. The parties do not explicitly ask the Court to interpret what AC or half-wave cycles mean, but it is useful to note this disagreement at the outset. With that being said, the Court will proceed to interpret the contested terms and phrases.

**II.    Legal Standard**

The meaning and scope of a patent's claims are determined as a matter of law. *Markman*, 517 U.S. at 372. Courts normally interpret terms according to their "ordinary and customary" meaning as a person with ordinary skill in the craft would understand them at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en*

*banc*). Courts assume the skilled person reads claims in the context of the particular claim and in context of the entire patent. *Id.* Every term is not necessarily technical. Sometimes the skilled person and "lay judges" find a term's meaning "readily apparent" and apply the "widely accepted meaning of commonly understood words." *Id.* at 1314.

The "ordinary and customary" meaning rule has only two exceptions: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as a lexicographer, the patentee must clearly express an intent to redefine the term and provide a definition that differs from the plain and ordinary meaning. *Id.* (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)). To limit a term's meaning, the patentee must include "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* at 1366 (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). The standard to satisfy both of these exceptions is "exacting." *Id.*

A court interpreting claims starts with "the words of the claims themselves . . . ." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). If a term in a claim contains an express limitation regarding the term, then the term itself should not be interpreted to include that limitation. *Phillips*, 415 F.3d at 1315. For example, the term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel." *Id.*

When looking at several claims, the doctrine of claim differentiation presumes "different words used in different claims result in a difference in meaning and scope for each of the claims." *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000). This presumption is "at its strongest" when a limitation sought to be construed into an independent claim is already in a dependent claim. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012)

(citing *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). For example, if an independent claim uses the term "code" and the subsequent dependent claim uses the term "spreading code," there is a "powerful argument *against* construing the term 'code' restrictively, to mean 'spreading code.'" *Id.* (emphasis added). This argument may be overcome by "strong contrary evidence such as definitional language in the patent or a clear disavowal of claim scope . . . ." *Id.*

Courts also turn to the patent specifications and descriptions when deciding how to construe claims. *Innova/Pure Water, Inc.*, 381 F.3d at 1116; *see also Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987) ("Claims are not interpreted in a vacuum, but are part of and are read in light of the specification."). While specifications can help understand what a claim means, a court cannot "read a limitation into a claim from the specification." *Innova*, 381 F.3d at 1117. In other words, "the written description will not be used to limit claim language that has broader effect." *Id.* Again, this is unless the two exceptions mentioned above, definitional language or disavowal of scope, are present in the specification. *Id.*

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### III. Construction of Disputed Terms

#### a. Power Conversion Module

The term "power conversion module" appears in Claims 1 and 19. '719 Patent col. 23 l. 37; col. 26 l. 23. In Claim 1, the term appears as follows:

> [A] *power conversion module* electrically coupled to the power source, the power conversion module being configured to receive the DC electrical power, convert the DC electrical power to an AC electrical power, and provide the AC electrical power to a first output and a second output, the AC electrical power being configured to illuminate one or more of the plurality of light emitting diodes . . . .

*Id.* at col 23 ll. 37–44 (emphasis added). Claim 19 describes "a power conversion module

for providing an electrical power configured to illuminate one or more of the plurality of light emitting diodes via the probe . . . ." *Id.* at col. 26 ll. 22–24.

For both Claims 1 and 19, Ulta-Lit argues that the term should be construed with its plain and ordinary meaning or as "a module that converts power." (Doc. 72 at 2). Simple Living argues it should be construed as "electronic circuitry for processing the electrical power received from the electrical power source so as to provide AC power for use by the diagnostic device." (*Id.*)

Ulta-Lit argues that two problems arise from Simple Living's proposed construction. First, it argues Simple Living's definition implies the power conversion module *must* "provide AC power for use by the diagnostic device." (Doc. 73 at 6). The second problem Ulta-Lit identifies in Simple Living's definition is that nothing in the claim requires the AC power be "for use by the diagnostic device." (*Id.*)

The term's context in Claim 1 says the power conversion module is "configured to receive [and] convert the DC electrical power to an AC electrical power." '719 Patent col. 23 ll. 39–40. This implies that the term "power conversion module" does not inherently mean a device that converts DC electrical power to AC electrical power. *See Phillips*, 415 F.3d at 1315 (noting that the term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel").

This implication finds support in the way Claim 19's uses "power conversion module." *See id.* (noting that terms normally are used consistently throughout a patent). Claim 19, an Independent Claim, says nothing about the module's configuration—which kind of power is being converted to which. In Dependent Claim 20, however, the '719 Patent states Independent Claim 19's power conversion module is configured to turn DC into AC. '719 Patent col. 26 ll. 43–48. By narrowing the term in Claim 20, the natural implication is that Claim 19's use of "power conversion module" is *not* limited to a module that converts DC to AC. *See InterDigital Commc'ns*, 690 F.3d at 1324 ("The doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.'")

(citation omitted)).

Simple Living's definition also urges the Court to construe the term as "electronic circuitry for processing the electrical power received from the electrical power source." (Doc. 72 at 2). This language appears to be lifted from one of the '719 Patent's descriptions, which says the "power conversion module *includes* electronic circuitry for processing the electrical power received from the electrical power source . . . ." '719 Patent col. 5 ll. 63–67 (emphasis added). By the Patent's own description, the power conversion module is more than "electronic circuitry for processing the electrical power received from the electrical power source." The Court declines to commit one of the "cardinal sins of patent law—reading a limitation from the written description into the claims." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001); *see also Innova*, 381 F.3d at 1117. In addition, Simple Living does not explain in its briefing why the court should include "for use by the diagnostic device," or what this descriptor means. It would appear from the claim's context that the LED lights are using the AC power, not the device. *See* '719 Patent col. 23 ll. 42–44 (stating that ". . . the AC electrical power being configured to illuminate one or more of the plurality of light emitting diodes"). Finally, Simple Living does not point to anything that would warrant deviating from the term's ordinary and customary meaning. *See Thorner*, 669 F.3d at 1365.

The Court construes "power conversion module" in Claims 1 and 19 to mean "a module that converts power."

### b. First/Second Output

The terms "first output" and "second output" appear in Claims 1 and 20. '719 Patent col. 23 ll. 41–42; col. 26 ll. 46–47. Ulta-Lit argues these terms should be construed with their plain and ordinary meanings or "an output that is distinct from the probe and the socket." (Doc. 72 at 2). Simple Living argues output be construed as the "end point of the power conversion module where the electrical power suitable for use by the diagnostic device is provided," or the "first/second connections from the power conversion module to the distinct probe/socket, wherein the electrical power suitable for use by the diagnostic

device is provided." (Doc. 74 at 9).

Both parties agree that "output" cannot include "probe" or "socket." (*Id.*; Doc. 74 at 8). Indeed, the Claims 1 and 20 contemplate that the probe and sockets themselves are connected to the first and second outputs, indicating that the outputs are distinct elements. *See, e.g.,* '719 Patent col. 23 ll. 45–48 (noting "a probe electrically coupled to the first output . . . an electrical socket electrically coupled to the second output" and "an electrical socket coupled to the second output"). The Court agrees, and it finds that the skilled person would also understand "output," as used in Claims 1 and 20, to not include the probe or socket.

Simple Living's proposed constructions include "where the electrical power suitable for use by the diagnostic device is provided" or some variation thereof. But it is not clear to the Court why this added language is necessary to define what an *output* is. It may be that an output fulfills this role in the context of the Patent, but it is not inherent to the nature of outputs to provide power for use by diagnostic devices. *See Phillips*, 415 F.3d at 1315.

Simple Living also suggests that the outputs function as "'connections' between the power conversion module and the probe or socket." (Doc. 74 at 8). During the *Markman* hearing, counsel for Ulta-Lit argued that equating the output to a line connecting the power conversion module to the probe, for example, would be too broad because the claim language contemplates a separate connection between the outputs and the probes or sockets. As stated in its brief, Ulta-Lit argued against equating an output to a connection "[t]o the extent Simple Living is attempting to read in a requirement that the outputs are anything more than 'electrically coupled' to the probe or socket . . . ." (Doc. 75 at 7). Ulta-Lit's counsel also argued that the output could not mean a single "end point" on the power conversion module because that would be too narrow of a definition. As stated in its briefing, Ulta-Lit concedes that an "'output' *could* be a point or even an end point of the power conversion module," but it argues that some embodiments show the output could be more than a single point. (Doc. 73 at 12) (emphasis in original). In short, the '719 Patent

presents a riddle: an output is not necessarily a point or a line between points, but something in between.

To resolve this apparent paradox, the court will construe "output" as "the place where electrical power leaves that is distinct from the probe or socket."

### c. In response to the AC electrical power provided to the LED light string

The phrase, "in response to the AC electrical power provided to the LED light string," appears in Claim 1.

> A diagnostic device for identifying a defect in a light emitting diode (LED) light string, the LED light string including a conductor disposed within an insulation layer and a plurality of light emitting diodes, the diagnostic device comprising: . . . a probe electrically coupled to the first output of the power conversion module . . . *wherein* the probe is configured to electrically couple to the conductor of the LED light string and the electrical socket is configured to electrically couple to a plug of the LED light string *such that* a first portion of the LED light string is illuminated and a second portion of the LED light string is not illuminated *in response to the AC electrical power provided to the LED light string* when the probe is electrically coupled to the conductor of the LED light string and the electrical socket is electrically coupled to the plug of the LED light string . . . .

'719 Patent col. 23 ll. 30–58 (emphasis added). Ulta-Lit argues that this phrase needs no construction because it is not limiting. (Doc. 72 at 2). Simple Living disagrees and argues it should be construed as "AC electrical power flowing through the LED light string causing the LEDs to illuminate." (*Id.*)

The central dispute for this claim is whether the phrase describes the device's result or a process therein. If a claim only expresses the invention's "intended result," then that part of the claim is not limiting. *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993). Such expressions are sometimes called "whereby clauses," which state the result of what an invention does, and this is not limiting because a result is not patentable. *Israel v. Cresswell*, 166 F.2d 153, 156 (C.C.P.A. 1948). Courts have applied the underlying principle expressed in *Israel* to other clauses, including "such that" clauses. *See C & C Jewelry MFG., Inc. v. West*, 2010 WL 2681921, at *4 (N.D. Cal. July 6, 2010); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 498 F. Supp. 2d 1131,

1196–97 (N.D. Iowa 2007); *Del. Display Grp. LLC v. Lenovo Grp. Ltd*, 2015 WL 6870031, at *4 (D. Del. Nov. 6, 2015).

The question is what "in response to the AC electrical power provided to the LED light string" adds to Claim 1. If nothing, then it simply describes a result and is not limiting; if something, then it is limiting. *See Tex. Instruments Inc.*, 988 F.2d at 1172. Ulta-Lit argues that the phrase at issue is not a limitation, but "merely . . . a result of the invention." (Doc. 73 at 14). It points to the "such that" preceding the phrase and argues that this type of clause is meant illustrate the '719 Patent's result. (*Id.*) Simple Living argues that phrase "is the process that the device performs. . . ." and argues that the phrase is properly read as part of the "wherein" clause. (Doc. 74 at 5). Nowhere in Simple Living's briefing does it address the "such that" clause, which Ulta-Lit originally identified in its Opening Claim Construction Brief. (*See* Doc. 73 at 13).

Upon reading the claim, the Court finds that the phrase "in response to the AC electrical power provided to the LED light string" is properly construed as part of the "such that" clause. Well before reaching the "such that" clause, Claim 1 notes "AC electrical power being configured to illuminate one or more" lights. Therefore, the "such that" clause adds nothing to the claim except to clarify why certain portions of the LED strand are illuminated, which is the intended result. Because this phrase is not limiting, it needs no construction.

**d. In response to the providing the electrical power**

Finally, Claim 19 contains the phrase "in response to the providing the electrical power . . . ." '719 Patent col. 26 l. 36. Ulta-Lit argues this term should be afforded its plain and ordinary meaning. (Doc. 72 at 2). Simple Living argues it should be construed as "AC electrical power flowing through the LED light string causing the LEDs to illuminate." (*Id.*)

As the Court noted when discussing "power conversion module," Claim 19 does not specify that the electrical power sent to the light string needs to be AC power. That specification comes in Dependent Claim 20, which implies that the electrical power

mentioned in Claim 19 has a broader meaning. *See InterDigital Commc'ns, LLC*, 690 F.3d at 1324.

Simple Living argues that the power in question here must be AC power, not DC power, because Claim 1 specifies that AC power is provided to the LED light string and that DC power would fail to illuminate any of the bulbs. (Doc. 74 at 6). Ulta-Lit contests this binary view of AC and DC power. It argues the '719 Patent's disclosed embodiments are not limited to "full-wave rectified waveform," which is the most common example of AC electrical power. (Doc. 75 at 12). Ulta-Lit notes that Figure 4B in the '719 Patent illustrates the device only supplying "half-wave cycles" to the LED light strands. (*Id.*) This half-wave cycle current, according to Ulta-Lit's expert, lies in sort of middle-ground between AC or DC and could be characterized as either form of power. (Doc. 75-1 at ¶ 6). And, as noted above, the parties do characterize this power differently. In any event, the Court finds that to the extent Simple Living argues the electrical power here must necessarily be construed as full rectified waveform AC power, such a construction is too narrow and belied by the '719 Patent's examples. *See Slimfold*, 810 F.2d at 1116 (noting the importance of a patent's examples in interpreting its claims).

Therefore, the Court shall construe "in response to the providing the electrical power" with its plain and ordinary meaning. *See Phillips*, 415 F.3d at 1314.

Accordingly,

**IT IS HEREBY ORDERED** that the parties shall adopt the constructions of the contested terms and phrases as described in this Order.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**IT IS FURTHER ORDERED** that the parties shall jointly file a proposed schedule to govern the remainder of this action within fourteen (14) days of this Order. The proposal shall include: the last day to serve final infringement contentions, completion of fact discovery on liability, last day to serve opening expert reports, last day to serve rebuttal expert reports, close of expert discovery, and the dispositive motion deadline.

Dated this 3rd day of June, 2021.

Honorable Diane J. Humetewa
United States District Judge